WATSON *v.* BARNETT.

4-4199

Opinion delivered December 16, 1935.

*Horace Sloan,* for appellants.

*Arthur L. Adams,* for appellee.

MEHAFFY, J. Drainage District No. 18 of Craighead County, Arkansas, was created by order of the county court of said county in the year 1918 as a drainage district under Act 279 of the Acts of 1909, and the acts amendatory thereof and supplementary thereto, commonly referred to as the Alternative System Drainage Law.

H. B. Watson, P. W. Lutterloh and F. E. Miller are the commissioners of said district. The district embraces a large acreage, and the assessments levied aggregate $763,650.87. The district sold bonds in denominations of $1,000 each, bearing interest at a rate of five per cent. per annum, payable semi-annually on February 1st and August 1st of each year, the first maturing August 1, 1925, and the last August 1, 1945. The district has paid all the bonds and interest to date, and, in addition, has purchased in advance of due date $79,000 of its bonds, leaving outstanding bond issue of $172,000.

The commissioners adopted the following resolution:

"Whereas, a large acreage of the land within Drainage District No. 18 of Craighead County, Arkansas, lying in the southern portion of said district, is still practically in the woods without any substantial improvements thereon, and did not receive complete reclamation by reason of the ditches in said district due to the maintenance of a dam in the main channel of St. Francis River by Drainage District No. 7 of Poinsett County, thereby damaging and rendering inadequate the outlet of Drainage District No. 18, and

"Whereas, commencing with the year 1930, practically all the owners of said lands discontinued paying the taxes due this district thereon because, as claimed by them, lands of this description and character constituted, even if cleared up, a hazardous farming operation due to incomplete drainage reclamation, and that such speculative value as they might possess was so largely destroyed by the depression that no person with any financial judgment would continue to pay the drainage taxes thereon; and

"Whereas, it is the judgment of this Board of Commissioners that it is to the best interests of the district, the property owners therein and the bondholders, to devise some plan whereby it will be financially feasible to place back said delinquent lands on the tax books, and continue the collection of drainage taxes thereon;

"Now, therefore, be it resolved by the Board of Commissioners of Drainage District of Craighead County, Arkansas:

"1. That any wild and unimproved tract of land heretofore sold to the said drainage district at its delinquent assessment foreclosure sale held on May 20, 1933, shall be sold by the district for a sum equal to twenty-five per centum of the delinquent installments of assessments that have accrued against it prior to and including the year 1934, the purchaser to assume and pay in full the installments of assessments payable in 1935 and succeeding years. If any purchaser shall not be able at the time of his application to purchase to pay said purchase price in full, he shall be given an option to pur-

chase conditioned on his paying of the date of the option 25 per cent. of the first year's taxes delinquent, and the 1935 tax in full and to pay each year thereafter 25 per cent. of the delinquent taxes for the next succeeding delinquent year plus the current drainage taxes in full until such time as the optionee shall have discharged all 1934 and prior taxes on a 25 per cent. basis, plus interest at six per centum per annum from the date of the option until date of payment on the sum paid on deferred delinquent taxes. When the full purchase price has thus been paid, the optionee shall be entitled to a quitclaim deed from the district subject to all future installments of assessments due the district. If the option-purchaser shall at any time make default (time being of the essence) in paying any portion of the purchase price (whether delinquent taxes or current taxes), then all of his rights under the option shall automatically cease and determine without any notice or demand by the district, and any amounts paid under the option on delinquent taxes shall not then be deemed as having discharged same on the basis of 25 cents on the dollar, but the amounts actually paid shall be credited on the full amount originally due, leaving the land still charged with the full amount of the delinquent taxes as though said option had never been executed, with credit only for the sums actually paid in under the option. A prior owner of land or his successor in interest, as the case may be, shall have the prior right of purchase. The chairman and secretary of the district are hereby directed and authorized to negotiate for, make, execute and deliver deeds or options, as the case may be, to carry out the terms of this resolution. This resolution shall remain in force and effect until January 1, 1936, unless sooner revoked by the order of the Board of Commissioners.

"2. That the purchase price of any lands foreclosed on and sold by the district may be paid in bonds or interest coupons of the district as is provided by Act No. 79 of the 1935 General Assembly.

"3. 'Wild and unimproved' land, within the meaning of this resolution, shall be construed to mean any tract of land comprised within a regular governmental

subdivision of a section and assessed as a separate unit on the assessment books of the district of which not more than 15 per cent. of the acreage therein was cleared at the time said land first became delinquent.''

The Mercantile Bank, for itself and other bondholders, brought suit in the Craighead Chancery Court to restrain and enjoin the commissioners from selling any delinquent lands for a sum less than would be required to redeem the same; that is to say, the full amount of delinquent taxes plus interest and costs, and to enjoin and restrain them from selling any lands under an option agreement, and asked that they be directed to sell lands only where the purchase price is paid in full at the time of the sale. It is asked that they be further enjoined from accepting any bonds or interest coupons of the district in payment of the purchase price of lands sold to the district for delinquent assessments. The plaintiff alleged the formation of the district, the assessment of benefits, the foreclosure and purchase of lands, and alleged that the sale of foreclosed lands as provided for in the resolution would be *ultra vires;* that act 79 of the Acts of 1935 is unconstitutional and void. They alleged that the commissioners had no authority to make the sales they were expecting to make and to carry out the resolution adopted.

The appellant answered denying the material allegations in the complaint. The following stipulation was entered into:

''This cause shall be tried upon the following stipulation as to facts:

''(1) That the allegations contained in paragraphs 1, 2, 4, 5, 6, 7, 8 and 9 of the complaint are true.

''(2) That the allegations in paragraph 3 of the complaint were true as of the date the complaint was filed, but at the time of this stipulation the district has paid, on their respective due dates, all bonds and interest coupons maturing to date and the total of the bonds originally issued by the district, consisting of maturities from August 1, 1936, to August 1, 1945, both inclusive, amounts to the sum of $266,000, of which the district has already purchased $55,000 of said bonds leaving a balance of out-

standing bonds of $161,000. That these bonds were purchased by the District at varying rates of discount, depending upon the proposition offered and maturities of the bonds, said bonds being purchased, some $0.55 on the dollar, some $0.60 on the dollar and some at other prices, but all at a very substantial discount.

"(3)   The following constitutes the tax levies made in the main district for the life of the bond issue, to-wit:

| Year | Rate of Tax | To Produce |
|------|-------------|------------|
| 1920 | 3.5% | $ 26,727.43 |
| 1921-1924, inc. | 3.0% | 22,909.22 |
| 1925-1945, inc. | 4.1% | 31,309.27 |

Grand total of all levies $763,640.87

"(4)   Subdistrict No. 1, to the main district, having a total acreage of 1,360 acres, and a total assessed benefits of $27,133.20, has the following tax levies:

| Year | Rate of Tax | To Produce |
|------|-------------|------------|
| 1921-1925, inc. | 3.5% | $   945.65 |
| 1926-1945, inc. | 5.0% | 1,356.65 |

Recapitulation for both Main and Subdistrict:
Combined assessment of benefits: $790,774.07

"(5)   The assessment of benefits in said district bear interest at 6 per cent. per annum.

"(6)   Several thousand acres of wild land, some of which may have had some small clearings thereon, but most of which were located in the south end of the district, were owned by the Chicago Mill & Lumber Company from the inception of the district, and that company continued to pay the drainage taxes thereon until the year 1930. Sometime thereafter that company got into financial difficulties, and its bondholders or trustees in charge of its affairs directed it to dispose of these and other lands at whatever price could be obtained, that considerable blocks of this wild land were sold for as low as $1 per acre, some were sold at $5 per acre. As an example of some of this land in the southern end of the district may be considered section 36, township 13 north, range 7 east, 640 acres. At the original tax rate of 4.1 per cent. of the assessment of benefits the annual tax on this tract was $944.64 per annum. In the foreclosure suit referred

to in the complaint it was delinquent for 1930, 1931 and 1932 or for a sum of $2,833.92, exclusive of penalty, interest and costs. In the meantime the 1933 and 1934 installments have become delinquent, and the 1935 installment has not been paid. When this tract became delinquent, practically none of the land was improved, it was poorly accessible from the highway standpoint and subject to back water overflow. The annual drainage tax at the rate above specified is $1.47 per acre. In addition, the land is subject to general taxes and to an annual St. Francis Levee District tax of $0.25 per acre.

"The last bonds of this district mature in 1945. If the district should now sell this tract on the option plan for 25 per cent. of the delinquent installments, plus current taxes, the district would receive per acre:

Total delinquent assessments for 1930, 1931, 1932, 1933, 1934, per acre are $10.35, 25 per cent. of which is .................................................................$ 2.59

Regular tax for 5 years (1935-1939) at $1.47 per acre is ......................................................................, 10.35

Total.............................................................$12.94

Purchaser also agrees to pay taxes for 1940-1945, 6 years $1.47.................................................$ 8.82

Total purchaser would finally pay district.................$21.76

"This land is primarily adapted to the raising of cotton and the usual grain or pasture crops raised in cotton country. On account of inadequate drainage, however, anything like a wet season crops would have to be planted very late, and if late overflow conditions obtained it would be likely that it would be too late to plant any cotton crops at all. Under such circumstances the market or actual value of this land is, to a great extent, a matter of speculation. There is in truth no fixed market value. A considerable amount of this land in the southern end of the district has been bought at the prices above indicated by small farmers either directly from the trustee of the Chicago Mill & Lumber Company or from other persons who did buy from the Chicago Mill & Lumber Company, and with very limited capital are attempting to clear up and improve parts of this area. Most of them

have purchased the land on long time credit basis, and in a good many instances, instead of paying cash have agreed to deliver so many bales of cotton per annum to the seller. A good many of them have defaulted on the undertaking to deliver cotton. It is the judgment of the commissioners of the district that $10 per acre for this type of land in the southern end of the district would be all that it is worth under existing conditions if sold not for cash and free from all future assessments of this drainage district. Other parties with a more speculative frame of mind might contend that this land would be worth from $15 to $25 per acre if sold for cash and free from all future drainage district assessments and under a good title, but there are no instances of any actual cash trades that would indicate any such value as that last indicated.

"At least 95 per cent. of all of this land in the southern end of the district is now delinquent and has been delinquent since the year 1930.

"(7) That the record of delinquencies in the whole district for the year 1934 and 1935 are as follows:

| Year | Total Tax Extended | Total Tax Collected | Total Tax Delinquent |
|---|---|---|---|
| 1934 | $15,361.23 | $4,902.26 | $10,458.97 |
| 1935 | 15,127.06 | 4,761.43 | 10,365.63 |

"(8) The lands involved in the southern end of the district are cut-over lands. There is substantially no merchantable timber thereon.

"(9) Of the tax delinquencies in the drainage district for the years 1930 to 1933, both inclusive, substantially 35 per cent. thereof has been finally paid to the district through redemptions, but practically none of these redemptions are on lands in the southern end of the district."

The court entered a decree as follows:

"On this the 9th day of November, 1935, before Hon. J. F. Gautney, chancellor in vacation, this cause is submitted in vacation by consent and agreement of all parties hereto, the same being submitted upon the complaint, amendment to complaint, answer to complaint and amendment thereto and stipulation of facts, from all of which

the court finds that this is a suit by the plaintiff, Mercantile Bank, a bondholder of Drainage District No. 18, Craighead County, Arkansas, against the defendants, as commissioners of said drainage district, to enjoin and restrain the commissioners from selling, pursuant to resolution adopted by the board of commissioners of said district, certain delinquent lands which were sold to the district by a commissioner in chancery at a delinquent assessment foreclosure sale on May 20, 1933, the sale having been confirmed and deed executed to the district on June 7, 1933, that in said resolution the district proposes to sell wild and unimproved land as defined in said resolution for a sum equal to 25 per cent. of its delinquent assessments, plus future assessments in full, and, where purchasers are not able to pay cash, to give them options to purchase upon payment of part of the purchase money in cash. That the district also proposes to accept its bonds or interest coupons in payment of the purchase price of said land and also to permit parties to use bonds as provided by act 79 of the Acts of 1935, in part payment of redemption moneys where redemption is affected.''

The appellants object to that part of the decree enjoining the sale of land until the lapse of the period of redemption, and appealed from that part of the decree.

The appellee objects to that part of the decree holding that the commissioners would have the power, after the expiration of the period of redemption, to sell lands on the basis stated in said resolution of the board of commissioners, or on any other basis than for the full amount of all delinquent assessments, interests and costs, together with undertaking to pay all future assessments.

The court made the following declaration of law: ''The court further finds that the commissioners of the defendant district are without any power to make a sale of any of the delinquent lands in the district either to the original owner or to any third party until after this period of redemption has expired.''

The declarations of law objected to by the appellee are as follows:

"(3) After this period of redemption has expired the court finds that it would be within the power of the commissioners of said district to sell the foreclosed lands acquired by the district for the sum mentioned in said resolution of the commissioners, even though said sum be less than the total amount of delinquent installments of assessments due the said district, together with penalty, interest and costs, and that the making of such a sale would not impair the obligation of any contract between the district and its bondholders or deny to the bondholders due process of law.

"(4) That when the district does acquire the power to sell the foreclosed land, it would likewise, as an incident to fixing the terms of sale, have power to grant options thereon or to make the sale wholly or partly on credit.

"(5) The court further finds that it would be within the power of the commissioners of the district to accept the bonds or interest coupons of the district on the purchase price of lands sold by the district as provided by Act 79, 1935.

"(6) The court further finds that in making redemptions the district has the power, within the discretion of its commissioners, to permit bonds and/or interest accrued on interest coupons to be accepted as part of the redemption money as provided by Act 79, 1935."

It is contended by the appellant that the improvement district may sell foreclosed lands prior to the expiration of the period of redemption. The lands, of course, could be purchased in the first place by a third party, or where the district buys at the foreclosure sale, it may assign its certificate of purchase to a third person. If the certificate may be assigned, or if the land may be purchased by a third person, there is no reason why the district, if it becomes the purchaser, may not sell the land before the period of redemption expires. Of course, in no event could the district or commissioners do anything that would prevent the owner from redeeming the land within the period allowed by law for redemption. The owner can redeem within the time allowed by law from the district, and the fact that the certificates of purchase

of the lands have been sold to some third person would in no way affect the owner's right to redeem it. While the law does not expressly authorize this district to issue certificates of purchase, it has implied power to do so.

We have held that the improvement district may assign the certificates of purchase before the time allowed to redeem. *Crow* v. *Security Mortgage Co.*, 176 Ark. 1130, 5 S. W. (2d) 346.

Act 79 of the Acts of 1935 provides that where the district has purchased at foreclosure sale any lands, it may receive from the owner of such lands at any time within the period prescribed by law for redemption from such foreclosure, bonds or coupons at face value. Of course, if it can sell to the owner, it can sell to any other person, because the one object is to get the lands back on the tax books so that the proceeds of the sale might be used for the payment of outstanding bonds, and the lands would be assessed and bear their part of the burden of the debts.

Section 2 of act 79, *supra*, authorizes the commissioners to sell any lands where title is acquired to any lands within the district.

It is contended, however, that act 79 impairs the obligation of the contract with the bondholders. We do not agree with appellee in this contention. See *Dickinson* v. *Mingea, ante* p. 946; *Drainage District No. 2 of Crittenden County* v. *Mercantile-Commerce Bank & Trust Co.*, 69 Fed. (2d) 138; *Myers* v. *Rolfe,* 71 Ark. 215, 72 S. W. 52.

We agree with the appellee that improvement districts and their commissioners have only such powers as are conferred upon them by statute, either expressly or by necessary implication, but, if the district could not sell the lands that it purchased at foreclosure sale, it would have no other use for them, and the authority to sell is therefore necessarily implied. We do not think the existence of the right of redemption negatives the power to sell during the period of redemption, because it does not in any way interfere with the owner's right to redeem.

The appellee contends that the commissioners cannot sell the foreclosed lands for less than the total amount due the district, and calls attention first to the case of *Chicago Mill & Lumber Co.* v. *Drainage Dist. No. 17*, 172 Ark. 1059, 291 S. W. 810. The court said in that case that the lien for the taxes continued until the taxes were paid or until the lands themselves were acquired by the district through sales for the nonpayment of taxes. In the case before us, the district has acquired the lands, and the price for which they may be sold becomes available at once, and may be used in paying the obligations of the district. The commissioners, of course, are required to act in good faith and sell the lands for the best prices obtainable.

The appellee says: ''While it is desirable that the foreclosed land be placed back on the assessment books, it is obviously equally desirable that it not be done in a manner which completely ignores the rights and interests of those taxpayers who have kept their taxes paid.''

It would certainly be in the interest of the other taxpayers to get these lands on the tax books and to have them sold at the best price obtainable.

Appellee calls attention to *Oliver* v. *Gann*, 183 Ark. 959, 39 S. W. (2d) 521. It is stated in that case: ''When the lands are bought in by the commissioners at the foreclosure sales, they become the property of the district to be used for the purpose of raising revenues to pay the bonds. The lands do not belong to the bondholders, and the district is not entitled to take credit, as contended by counsel for appellees, to any extent until revenues are raised by sale thereof. The lands thus purchased become the absolute property of the district, and express authority is conferred by the statute to sell the lands at prices fixed by the commissioners. The theory is, and the practice should be, in order to comply with the spirit of the scheme, for the commissioners in selling the land, to secure a sufficient price at least to cover the expenses, and all the delinquent assessments up to the time of the resale, so that the lands will bear their full share of the expense of the improvement. * * * But the lands had been acquired by the district under a sale properly made, and

it had the right to dispose thereof for a less amount than would have been required for redemption by the owner in order to get them back into private ownership where they were still subject to the payment of all the other assessments of benefits of the improvement district.''

As stated by the appellant, the districts are selling the land, and not the assessment of benefits.

It is next contended by the appellee that the district cannot exchange foreclosed lands for its own bonds as provided in act 79 of the Acts of 1935. He cites the case of *State ex rel. Murphy* v. *Cherry,* 188 Ark. 664, 67 S. W. (2d) 1024. In that case the court held that act 156 of the Acts of 1931 was unconstitutional and void. That act authorized the commissioners for drainage, levee and other improvement districts to accept at their face value past-due bonds or past-due interest coupons issued by said improvement district as full payment for taxes or assessments as they accrued.

It will be observed that act 156, which was held void, provided for the payment of assessments in past-due bonds. Of course, this would be inequitable because the payment of assessments in anything other than money would impair the obligation of the contract of the other bondholders, because the only way to pay bonds is by collecting the assessments from the landowners.

Act No. 79, *supra,* does not authorize the payment of assessments in bonds, but it authorizes the sale of land by the district which it has already purchased, and which this court has held it has a right to dispose of.

It is next contended by the appellee that the commissioners cannot permit the district's own bonds to be used for the redemption purposes as provided in act 79. If the district owns lands, it has a right to sell them for the best price obtainable, and, if no other sale can be made, or no better sale, it would then be the duty of the district and its commissioners to take in payment bonds or coupons as provided in act 79.

The bondholders are not interested in anything but having their bonds paid. It is unimportant to them how the lands acquired by the district are sold, so that suffi-

cient sums be raised by the assessment to protect their bonds.

It follows from what we have said that the judgment on appeal must be reversed and remanded with direction to dismiss the complaint, and that the judgment on cross-appeal must be affirmed.

It is so ordered.

BAKER, J., not participating.