DOUGLAS v. THOMPSON.

4-6826                                              176 S. W. 2d 717

Opinion delivered April 26, 1943.

*Harrelson & Harrelson, Mann & McCulloch,* and *Norton & Butler,* for appellants.

*Elton A. Rieves, Jr., John A. Fogleman, A. B. Shafer, Roy Church,* and *Wils Davis,* for appellees.

GRIFFIN SMITH, Chief Justice. Tri-County Drainage District, embracing lands in Crittenden, St. Francis, and Cross counties, was formed in 1914. Six percent serial bonds amounting to $400,000 were issued, with maturities September 1 of each year. Interest was payable in March and September, final obligations falling due in 1934. In 1918 a sub-district was created.[1] Its $45,000 of 5½% bonds matured over a period of eighteen years, the last falling due September 1, 1935.

Commissioners, all residents of Crittenden county, were W. B. Rhodes, C. W. Cooper, and John W. Scott.

S. H. Jones, claiming to be a bondowner, made certain allegations in a suit filed in Crittenden Chancery Court, in consequence of which Rhodes, Cooper, and Scott were appointed Receivers October 10, 1932. The Court's direction was that the Receivers executed bond for $50,000. Sureties, *prima facie,* were Z. T. Bragg and H. C. Williamson.[2]

In addition to various business interests, including farming on a large scale, Rhodes was cashier of The Bank of Marion.[3] He seems to have been in virtual control of the institution and administered its affairs in a personal manner. This bank was designated in the receivership order as depository. The Bank became insolvent and was taken over by the State Commissioner February 7, 1938, although the deputy commissioner (R. E. Robertson) did not assume his duties until February 21.

It is alleged in appellants' brief that Rhodes, Scott, and Cooper did not file a report or publish any information until December 3, 1937—more than two years after the last bond of the sub-district had matured, and more than three years after bonds of the principal district were past-due.

---

[1] All references to "the District" include the sub-district unless otherwise indicated.

[2] The term *"prima facie"* is used because it is contended, and the Court found, that Bragg and Williamson did not sign the document in question.

[3] Early in February, 1938, Rhodes committed suicide. Some time later Scott, also, committed suicide. Appellants allege that Cooper did not actively participate as a Commissioner.

In these circumstances—having served as commissioners for eighteen years, and as receivers for five years—Rhodes, Scott, and Cooper filed a petition alleging that bonds were outstanding. Prayer was that a six percent levy on the assessed betterments be extended for 1938. Three days later the order was made.

Following insolvency of the Bank of Marion and suicide of Rhodes and Scott, C. II. Bond, L. L. Barham, and Luther Wallin were appointed co-receivers.

It is contended that landowners did not learn additional assessment had been made until they began paying taxes in 1938. As a consequence of conferences had by those affected, attorneys were employed to determine whether the tax should be paid.

Failing to find records it had been presumed were kept by the Commissioners, and in the absence of reports by the Receivers, John A. Ellis, a Memphis public accountant, was employed by landowners to make an audit.[4]

Ellis began work April 15, 1938.[5] He ascertained that virtually all records pertaining to the District had been kept by Rhodes in his office in the bank building. It is stated in a brief that these records were "among [Rhodes'] private files." There is the further contention, supported by Ellis' testimony, that because of the indiscriminate manner of bookkeeping, there was no way to distinguish between bank records, district records, records of the commissioners, and records pertaining to the receivership, without referring to private records kept by Rhodes.

---

[4] Emphasizing Ellis' ability and proficiency, appellants direct attention to certain facts developed by the testimony: that the accountant had practiced his profession twenty years; is a graduate of Millsaps College, and at times had been retained by the City of Memphis to audit various bureaus. He had been employed by many corporations and by private business concerns.

[5] Appellants' brief contains this statement: "The Bank of Marion was in liquidation, in charge of R. E. Robertson. . . . A. B. Goodrum of the firm of Russell Brown & Company, of Little Rock, was making an audit of the bank for the State Commissioner under the supervision of Robertson. . . . Robertson and Goodrum cooperated fully with Ellis and permitted him to make an examination of the papers, records, documents, etc., relating to the affairs of the districts."

The audit was completed August 15, 1938. Irregularities by Rhodes, in which Scott is alleged to have participated as beneficary, are many.[6]

Scott owned numerous farms, and also appears to have been engaged in the real estate business. He and Rhodes were associated in agricultural operations.

Robertson, as receiver, and A. B. Goodrum, an accountant representing Russell Brown & Company in auditing the bank's books, coöperated with Ellis. Due to the incompleteness of records, and to inconsistencies in bookkeeping, Ellis was not able to definitely determine the amount of bonds outstanding at any designated period. L. K. Thompson, of Memphis, claimed to own bonds of the par value of $43,000. These were acquired, according to appellants, in aid of a conspiracy with Rhodes, Scott, and others, who are thought to have designed a plan for converting the District's misfortune into personal financial gain.

When the Ellis audit was filed and Receivers, having ample time to proceed in the District's interest, failed to act upon information disclosed, A. G. Douglas and others (September 19, 1938) intervened in the suit under which such Receivers were appointed.

As evidence was taken and facts were developed, additional pleadings were filed. These were in the nature of amendments to the intervention. The substituted Receivers were made defendants. Liability was asserted against the following: (1) The estate of John W. Scott. (2) The estate of W. B. Rhodes. (3) Z. T. Bragg and H. C. Williamson, sureties. (4) The estate of Howard Curlin. (5) Bank of Marion. (6) J. C. McCaa. (7) The District's present receivers. (8) C. W. Cooper. (9) Officers of the defunct bank. (10) L. K. Thompson.

Service was either had upon all parties, or those not served participated in such manner as to make service unnecessary. Thompson answered. In a counter claim he

---

[6] Appellants' brief contains this reference to Cooper: "Apparently he took no interest or active part in the affairs of the district. He was content to let Rhodes and Scott conduct the district in their own unique way. Apparently he did nothing about the district and received nothing in return."

asked for judgment against the District for the bonds he claimed to own.

May 6, 1939, J. C. Young was appointed as the Court's Commissioner. His first report was made September 5, 1941. With the exception of a part of the Thompson claim, all issues were found against the interveners.

The appeal questions correctness of the Court's action in allowing Thompson to recover $36,293.66, and in declining to render judgments (a) against the bank for $25,436.56, representing the aggregate sums Rhodes is alleged to have diverted from the District's assets while such funds were on deposit or after they came into Rhodes' hands as district assets with the institution Rhodes managed: (b) against the estate of John W. Scott for $32,516.27; (c) against Z. T. Bragg and H. C. Williamson, jointly and severally, for $32,516.27; and, (d) against the estate of Howard Curlin for $1,815.71. Appellees moved in this Court to have the appeal dismissed for failure of appellants to sufficiently abstract. If such deficiency existed the error was cured by appellants' supplemental abstract filed December 21, 1942, with leave.

Appellants state in their reply brief that after the transcript was filed the administrator of the Rhodes estate, to whom had been presented the claim of $32,516.27, agreed with attorneys representing the landowners and with Receivers for the District that a payment of $7,500 would be made. The claim had been disallowed by the administrator and was pending in the probate court. The offer was accepted in consideration of a covenant not to sue. Chancery approved. It is now conceded by appellants that the aggregate of $25,436.56, asserted against the Bank, should be credited with $7,500, leaving a balance of $17,936.56.

Amounts sought to be recovered from the Bank are listed in the audit under eleven schedules, $22,101.12 having been compiled from debits against the District evidenced by unauthorized memoranda. Withdrawals by charge tickets bearing no signature amount to $3,042.99. Another item is "check to C. R. Head, $292.40."

The claim of $32,516.27 against the estate of John W. Scott is a composite of District funds diverted to unauthorized purposes and not accounted for by the Receivers, funds diverted from assets of the District by bond manipulations, withdrawals from District account, and profits made by receivers on bond purchases. Claims against Bragg and Williamson as sureties are the same as those urged against the Scott estate—$32,516.27.

As to the amounts sought to be recovered from the Curlin estate, deposits are alleged to have been credited to his bank account as part of the profits realized from bonds purchased at a discount by Rhodes and perhaps others. It is contended that District funds were used and that the bonds were redeemed at par. As an indication of the scope of the litigation, various pleadings and filing dates are shown in the margin.[7]

---

[7] Original petition for appointment of receivers, October 8, 1932; answer of the District and Commissioners, October 8, 1932; order appointing receivers, October 10, 1932; order appointing receiver in succession for W. B. Rhodes, February 10, 1938; order appointing receiver in succession for John W. Scott, February 24, 1938; appointment of Luther Wallin as co-receiver, March 18, 1938; intervention of A. G. Douglas and other landowners of the District, September 19, 1938; order on intervention, September 19, 1938; entry of appearance of L. K. Thompson, October 21, 1938; Thompson's answer and counterclaim, December 15, 1938; State Bank Commissioner's answer to intervention, December 15, 1938; response of receivers to intervention, December 20, 1938; receivers' answer to intervention, February 13, 1939; response of interveners to counterclaim of L. K. Thompson, February 17, 1939; amendment to answer bank commissioner, February 17, 1939; motion of L. K. Thompson to require receivers to pay interest on bonds, February 17, 1939; amendments to intervention. February 17 and March 13, 1939; C. W. Cooper's answer to intervention, March 20, 1939; separate answer of bank commissioner to amendment to intervention, April 25, 1939; separate demurrer of J. F. Rieves, Sanders Danner, S. H. Jones, April 25 and May 16, 1939; answer of C. H. Bond, Luther Wallin, and L. L. Barham, April 25, 1939; answer of J. A. McCaa and Howard Curlin, April 25, 1939; order appointing commissioner in chancery, May 6, 1939; separate answer of Bank of Marion and bank commissioner, May 16, 1939; answer of Z. T. Bragg and H. C. Williamson, June 16, 1939; amendment to intervention, July 3, 1939; petition of interveners for order for examination of signatures of Bragg and Williamson, November 17, 1939; motion to quash interveners' depositions, December 12, 1939; receivers' motion to dismiss, December 12, 1939; motion of bank commissioner and others to dismiss, March 18, 1940; objections by defendants to testimony taken by interveners, May 16, 1940; petition of receivers to require interveners to file bond, June 24, 1940; motion of interveners to revive as to C. W. Cooper, September 9, 1940; answer to amendment to intervention by receivers, September 26, 1940; motion of interveners for rule on court reporter, March 1,

In response to the Jones petition, answer was filed by Rhodes, Cooper, and Scott, as commissioners, in which it was asserted that all bonds maturing *prior to 1931* had been paid. It was then alleged that $24,000 of $32,000 *maturing September 1, 1931,* had been paid, leaving $8,000 delinquent; that $34,000 would mature September 1, 1932, $36,000 September 1, 1933, and $31,000 September 1, 1934—a total of $109,000.

Between October 10, 1932, and a date not designated, the Receivers are alleged to have collected and disbursed $134,905.83, ". . . this being approximately $25,000 more than the total bonds reported outstanding when Receivers were appointed." There was the cumulative contention that no improvements had been made, no maintenance costs had been incurred, and that the Receivers served without authorized pay. Despite what, in effect, the interveners pointed to as inconsistencies, the Receivers reported that on December 3, 1937, $43,000 of bonds, exclusive of interest, were outstanding. There was reference to the Court's order of March 31, 1938, in which it was recited that Thompson was the owner of bonds equal in amount to obligations referred to by the Receivers.[8]

Listed in assets of the defunct Bank were $8,000 of Tri-County bonds maturing September 1, 1934, and $7,000 of the sub-district's bonds, four of which matured

1941; stipulation of parties for separate submission of issues, August 15, 1941; receivers' petition on Thompson issue, September 5, 1941; report of commissioner, September 5, 1941; amendment to commissioner's report, September 18, 1941; petition of interveners for citation, October 14, 1941; response, October 16, 1941; order on petition for citation, October 20, 1941; report of commissioner, October 20, 1941; interveners' exceptions to report of commissioner, October 20, 1941; additional exceptions of interveners to commissioner's report, October 20, 1941; exceptions of L. K. Thompson to report of the commissioner, October 20, 1941; decree, October 20, 1941.

[8] By consent the order of December 6, 1937, was modified, the effect of which was to authorize 40 percent of the levy extended against 1938 benefits to be paid that year and 60 percent to be paid during 1939 and 1940. Aggregate assessments were $45,917.34. [A comment by the Auditor is: "It is noted that L. K. Thompson signed a receipt dated December 22, 1937, for $7,504, including the payment of $4,000 for four bonds. However, the petition of December 3, 1937, and the order of March 31, 1938, between which dates the $4,000 was receipted for by Thompson, both recite that bonds in the amount of $43,000 were outstanding."]

September 1, 1935. The remaining three matured a year later. The eight $1,000 bonds of the principal district were carried on the Bank's books at $4,800, while the seven $1,000 sub-district bonds were carried at $4,200. A court order of April 1, 1938, recites that the Bank Commissioner's investigations disclosed payment of the bonds; hence, if there should be recovery, said the Commissioner, ". . . it would be necessary to proceed against those responsible for the act of setting into the assets of said Bank bonds that have been paid." The Court authorized the District and sub-district to be credited and the bonds to be charged to "other resources."[9]

An allegation by the interveners was that all bonds had been paid, and that if Thompson had possession of the so-called securities, he was not a holder for value without notice, but obtained them through gross fraud in collusion with Rhodes and others who occupied fiduciary relationships to the District.

The deceit alleged to have been consummated by Rhodes consisted in handling the fraudulently-procured bonds. In some instances purchases were made through the Bank's account. These transactions, while ostensibly for the benefit of the Bank, were so effectively disguised that it was difficult to trace essential movements which originated in the fraudulent impulse, and to follow them at every turn until the purpose to loot the District's treasury had been consummated; yet, entries actually made on the Bank's books, and temporary disappearance of assets that usually reappeared when bonds purchased at a discount could be paid, were, with other facts and circumstances, evidence which pointed to manipulation of accounts, the withholding of credits, and a division of profits—in short, violation of the trust imposed by law and good conscience.

The Court's Commissioner found that Thompson acted collusively with Rhodes in regard to the $43,000 of

[9] In addition to the fifteen $1,000 Tri-County bonds carried by the Bank at $9,000, there were ten $500 bonds and two $100 bonds of Drainage District No. 7. Although par value of these bonds was $5,200, they were carried at $4,680; par value of all bonds was $20,200, carried by the Bank at $13,680.

bonds,. but recommended that the procurer of these securities be allowed their principal cost of $25,183.39. Interest was $11,110.27, making a total of $36,293.66. All other claims were disallowed. The Court adopted and confirmed the Commissioner's findings.

Specifically, appellants charged that in some instances bonds were bought at a discount with District funds, and when paid at par, profits (ordinarily) were divided between Rhodes, Scott, and Thompson. There is the more serious accusation that bonds would be paid, no record of serial numbers or maturity dates retained, and then the certificates would reappear in the hands of these sinister speculators, only to be sold again and charged to the District.

That Rhodes (or some one for whose acts he was responsible) practiced duplicity of this kind is evidenced by the Bank Commissioner's voluntary statement that Tri-County and District No. 7 bonds of the par value of $20,200 were among the Bank's assets, although investigation disclosed that they had been paid. When, therefore, the District's Commissioners, in their response of October 8, 1932, informed the Court that bonds aggregating only $109,000 were unpaid, and subsequently net collections as designated were made, and it was still contended there was a bond debt of $43,000, and when a six percent assessment against benefits of $908,-805.59 was asked—quite naturally, say appellants, they were concerned with an administration which either grossly understated the District's obligation, or fraudulently concealed application of taxpayer money.

A defense by Thompson is a letter he wrote to Rhodes January 17, 1935. There is a reference to bonds of District No. 2. Thompson said: ''I have changed this contract as per your suggestion to cover Drainage Districts 3, 6, 7, and 8. I am leaving out Tri-County at your request, and No. 5, because practically all of these bonds are held by myself or one of my friends.'' Rhodes was requested to check the agreement and, if he approved, to sign one copy and return for completed execution. The document (found by Ellis) was dated January 28,

1935. A provision is that each party should discourage all litigation relating to the districts, "save only such as is necessary to insure the collection of installments of benefits."

There was this further statement: "[Neither party] .shall engage in the purchase of any bonds of either of the above drainage districts except under this agreement, and all bonds purchased by either party after January 1, 1935, shall be held by the joint account. Profits arising from these transactions shall be equally divided, . . . and neither party shall be required to look into the disposition of the other part of the one-half paid to such party."

Notwithstanding answer of the District Commissioners in October, 1932, showing outstanding bonds to be $109,000, the Ellis audit discloses that $18,000 of sub-district bonds were unpaid. He says that "apparently" the Commissioners ignored this fact. Of course, if $109,000 in bonds of the principal district were outstanding, and $18,000 of the sub-district were unredeemed, it results that the debt, exclusive of interest, was $127,000. But this conclusion would not necessarily follow from what Ellis says if in the item of $109,000 established by the Commissioners, sub-district bonds were included, or if other facts to be hereafter discussed affected the transaction. There does not seem to be substantial proof questioning accuracy of Ellis' testimony that against this fixed liability cash collected and bonds accepted in payment of taxes amounted to $156,309.90.[10]

Ellis refers to a report made March 31, 1932, by C. R. Head. It showed payments of $319,000, leaving a balance of $126,000 of $445,000.

A circumstance to consider is that the District Commissioners' answer to the Jones complaint, in listing the

---

[10] "Net" collections appear to have been arrived at by taking the gross ($156,569.10) and deducting certain so-called "offsetting" items. The deductions are not explained in .detail, but seemingly were substracted alike from gross receipts and gross disbursements. For example, at page eighteen of the audit where $156,569.10 appears, receipts include $13,604.05 classified as offsets, while a schedule of disbursements on page sixty-three reflects equal totals under a subheading "Restored Charges." Subtracting $13,604.05 from $156,-569.10 leaves net receipts of $142,965.05.

four yearly maturities aggregating $109,000, made the statement that the district issued $400,000 of bonds—not $445,000, which would be the aggregate of the two districts. The Chancellor's decree of October 10, 1932, appears to have been in response to Jones' complaint against "Tri-County Drainage District," the Commissioners having been joined as defendants. The Court's order appointing Receivers mentions *the* District. However, when appellants intervened September 19, 1938, they expressly referred to the sub-district. The two districts were thereafter treated as an entity except in identifying bonds.

Testing whether the District Commissioners, in answering that principal obligations of $109,000 were outstanding, and in an effort to determine whether the reference was to bonds of the main district only, the following may be considered in connection with Thompson's certificate identifying serial numbers of bonds he says he handled subsequent to the contract of 1935. Comparison is with bonds retired, as shown by the Ellis audit.

The analogy is this: The highest serial number referred to by Ellis is 551. Sub-district bonds were numbered from 1 to 45. The higher number, that is, 551, could represent only a bond of the principal district. The Commissioners stated in their answer that 1934 maturities were $31,000. The lowest number claimed by Thompson in his 1934 list is 521. Counting 521 to 551, inclusive, thirty-one bonds would be represented. This agrees with the item of $31,000 the Commissioners said would mature in 1934.

For 1933 Thompson claimed he held numbers 485 and 520. Twenty-three other bonds serially numbered between these two extremes were claimed by Thompson —a total of $25,000 of the $36,000 of 1933 maturities. Inclusive of numbers 485 and 520, there would be 36 bonds.

Using similar methods of computation for 1932 maturities, serial numbers would be 451 to 484, inclusive— 34 bonds.

Of $32,000 which came due in September, 1931, the Commissioners claimed $8,000 unpaid. Thompson's

statement shows that he once held two of the eight due in 1931, these being numbered 419 and 420.

A strong presumption arises, when the serial numbers are considered, and when it is seen exact amounts are accounted for, that the Commissioners, in reporting $109,000 outstanding, did not include sub-district bonds. In reaching this conclusion, we assume that the bonds Thompson claims bear the serial numbers mentioned in his certificate.

As we have seen, the Head audit showed payments of $319,000. This must have included both districts, for Ellis speaks of "the total issue of $445,000." Ellis points out that between Head's audit and October 12, 1932, records (presumably kept by Rhodes at the Bank) showed disbursements of $16,936.57, of which $13,000 was thought by Ellis to have been for retirement of principal of bonds. This inference is drawn from cancelled checks and other bank memoranda.

Conflicting possibilities are presented. (1) Did the Commissioners, in reporting $109,000 of $400,000 outstanding, procure their information from the Head audit? (2) If so, did they disregard bonds of the sub-district which were included in Head's balance of $126,000? (3) In reporting $109,000 of the principal's district's bonds, were the Commissioners uninformed that, between the date of Head's audit and their representations to the Court, $13,000 of the remaining $109,000 had been paid?

If payments Ellis indicates were made subsequent to the Head audit were applied to the balance of $126,-000, remaining overall obligations would have been $113,000. Continuing the analogy still further, if payments aggregating $13,000 were used to retire bonds of the first, or $400,000, issue, then the balance of $109,000 certified by the Commissioners would have been $96,000. If to this remainder there is added $18,000 of sub-district bonds, total indebtedness at the time the Commissioners answered (exclusive of interest) was $114,000.

Between October 17, 1932, and April 15, 1938, bonds of the two series amounting to $70,000 were retired; or

$83,000 if data found by Ellis in the Bank, and affecting transactions subsequent to March 31, 1932, and prior to October 17 of the same year, are given effect. This item of $83,000, if subtracted from the Head balance of $126,-000, would leave $43,000—the exact balance Receivers certified to be outstanding December 3, 1937. It is the amount the Chancellor determined as debt to the District, or of the District and sub-district.[11]

Appellants direct attention to payments aggregating $7,504 by Rhodes, shown by cashier's checks for $3,500 and $4,000 dated December 11, 1937, and $4 by debit memorandum upon which the notation appears, "Balance payment L. K. T. & Co." Thompson, by receipt of December 22, acknowledged the payments and that four Tri-County bonds were retired. The difference of $3,504, he says, was interest. But, assert appellants, bonds outstanding December 3 were $43,000; hence, they insist, the $4,000 payment should have reduced the remainder to $39,000. This would be true if the $43,000 included sub-district bonds, four of which are shown to have been held by Thompson.

It is argued on behalf of Thompson that the Commissioners were dealing with main district bonds when they reported; further, that the Chancellor, in finding (March 31, 1938) that Thompson owned $43,000 of the District's bonds, had before him the answer in which it was admitted that of the original issue of $400,000, $109,-000 remained unpaid. This contention is reinforced when it is observed that the Commissioners asserted such bonds drew interest at six percent. Sub-district bonds bore interest at five and one-half per cent.

We conclude, therefore, that the evidence is not sufficient to disprove Thompson's claim that he held $43,-000 of bonds after the payment of $4,000 had been made. Included in the list were four sub-district bonds and thirty-nine main district bonds.

---

[11] If the $18,000 of sub-district bonds be added to the item of $109,000 reported by the Commissioners, the total would be $127,000 instead of $126,000—a differential of $1,000. This is unaccounted for except speculatively.

The fact that Thompson owned $43,000 of bonds having been established, it becomes necessary to consider charges made by taxpayers as interveners that Rhodes, Scott, Thompson and others conspired to defraud the District, and to determine whether Rhodes, while ostensibly acting as cashier of the Bank, was in truth a participant in illegal transactions having for their purpose the redemption at par of bonds purchased at substantial discounts. That such dealings were engaged in with Thompson as a party to financial vermiculations seems too clear to admit of doubt. The Court's Commissioner found that Thompson entered into a conspiracy with two of the Receivers (Rhodes and Scott) ". . . to defraud the District with a view of making profits for themselves. . . . Thompson knew he was dealing with Receivers . . . in assembling the District's bonds and in obtaining payment at a profit rather far in excess of what he and the Receivers paid for them." [12]

Many activities of Thompson and Rhodes support the Commissioner's conclusions that the District was defrauded. In his letter of January 17, 1935, enclosing the contract dated January 28, Thompson said he was excluding Tri-County bonds at Rhodes' request ". . . because practically all of those bonds are held by myself or one of my friends." In an affidavit of December 7, 1939, Thompson says he purchased bonds of the District and its subsidiary. He made a list of these securities, showing serial numbers, maturity dates, and *dates of purchase*. Seventy-seven bonds are identified, the first purchase of main district obligations having been on May 25, 1935—nearly four months after the contract with Rhodes was made. He began buying sub-district bonds March 15, 1935.

---

[12] Additional comment by the Commissioner was: "The conclusion [that a conspiracy existed] is drawn from the fact that Thompson dealt with Rhodes and Scott (and with Rex Wheeler, attorney for the District), where, on the other hand, if he had been dealing with the Bank of Marion only, W. B. Rhodes would have been the only party to this transaction with Thompson. It is your Commissioner's opinion that where Thompson knowingly dealt with [Rhodes and Scott] and used their services, (and from the records [used] some of the money held in trust by them) he is not entitled to profit by [such transactions]."

It follows that when Thompson wrote Rhodes in January that he or one of his friends held practically all of the securities, Thompson did not own a single bond unless it was later sold and then repurchased, and this is not suggested. This conclusion finds affirmation in District records showing payment to Thompson for thirty-four bonds and to Mississippi Valley Trust Company for one bond.[13] It is noteworthy that after Thompson and Rhodes began working together, only one bond escaped them.

April 15, 1935, Thompson acquired sub-district bond No. 45, with accrued interest, for $725. April 11, preceding, Rhodes wrote Thompson:—"Bought a sub-district Tri-County this morning, due this fall, with past-due coupon attached, cost $725. Will let it come over as soon as it is received."

A few of the transactions wherein Thompson and Rhodes are connected are:

*Example No. 1:* May 22, 1935, Peltason, Tenenbaum & Harris, Inc., of St. Louis, invoiced to Bank of Marion five of the six percent bonds for a flat price of $3,850. Ellis testified that on May 23 the Bank's draft on St. Louis was issued for the amount involved. Rhodes thereupon drew a draft "on Memphis" for an equal amount. The bonds are identified by numbers. Thompson, in his certificate, says that on May 25 ". . . I purchased bonds [corresponding in number] from [the St. Louis firm] . . . through the Bank of Marion, paying $770 per bond, flat."[14]

*Example No. 2:* December 2, 1935, E. R. Bruce invoiced to "W. B. Rhodes" five bonds. The contract called for a "flat" price of $4,800, including $900 in accrued interest. Bruce drew a draft through the Bank of Marion. Either the Bank or Rhodes drew on Thompson immediately for the same amount. Thompson, in his affidavit, says the bonds were bought from Bruce through Bank of Marion December 4, but Bruce charged the purchase to Rhodes as distinguished from the Bank.

[13] The one bond held by Mississippi Valley Trust Company was paid February 18, 1937. This was before the balance of $43,000 was determined.

[14] Five bonds at $770 would amount to $3,850.

Thompson attempts to justify his actions—at least he seeks to ameliorate what appellants contend is an injury—upon the ground that the District cannot complain because, in any event, it was obligated to pay its bonds at par, and in the order of their maturity. *State ex rel. Murphy* v. *Cherry,* 188 Ark. 664, 67 S. W. 2d 1024; *Watson* v. *Barnett,* 191 Ark. 990, 88 S. W. 2d 811. Conceding that it was the duty of Receivers to apply the money as indicated, it does not follow that Thompson and Rhodes would be excused for entering into a conspiracy to manipulate District funds, and that Rhodes' position as a fiduciary could be used in aid of the plan to "corner" the market on Tri-County bonds. Any information Rhodes had regarding the District's affairs should have been equally available to all taxpayers, and, incidentally, (within reason) to bondholders or prospective purchasers.

A final example of manipulation of funds is shown in connection with Thompson's purchase of $58,000 worth of bonds from a bondholders' committee in St. Louis. Confirmation of the sale was sent July 13, 1936, the price being $860 per bond exclusive of accrued interest. All were a part of the $400,000 issue and drew six percent. In his certificate Thompson says purchase was July 20. On July 20 St. Louis exchange was issued for $12,743.33 and charged to the District's account with Bank of Marion. Included in the payment were seven bonds Thompson says he had concurrently bought for $860 each. In other words, the District's money was made available to Thompson in consummation of a deal whereby he profited $140 per bond.

*Bank of Marion.*—While the Bank, when it closed, is alleged to have been indebted to the District in the sum of $38,886.54, certain payments by Federal Deposit Insurance Corporation, adjustments, and waivers, reduced the claim to $25,463.56.[15] The demand is made up of eleven items, the first being for $3,042.99. It is asserted by Ellis in the following manner:

In June, 1933, the District should have received $7,492.99 from tax sources, regarding which there does

---

[15] This item appears in appellants' brief as $25,436.56, a difference of $27. The discrepancy is not important.

not appear to be any dispute. Of this sum $4,450 was used in paying bonds, presumably seven. Difference between the amount received and the amount which benefited the District, $3,042.99, was evidenced by cashier's check payable to cash for $2,244.99, and by another for $798. On June 30, the checks were cancelled without apparent value to the District. However, deposits to certain accounts were made as follows: "Earle Place," [16] $1,328.33; W. B. Rhodes Farm Account, $395.33; R. V. Wheeler, $1,014.33; amount not traced, $305.

October 11, 1933, $8,631.40 was received for the District's account. An unexplained charge of $4,000 made August 23 was "restored." Other receipts, less legitimate charges, accounted for $4,631.40. These transactions should have increased the bank balance by $8,631.40. The actual increase was $1,596.40, leaving a deficiency of $7,035. Deposits thought by Ellis to represent District funds administered in a wayward manner were made August 23 and October 11 as follows: To the Bank's individual bond account, $3,600; to the Bank's interest account, $10; to Earle Place, $162.50; to W. B. Rhodes, $262.50; to R. V. Wheeler, $500; to Rhodes and Donahue, $100; to Rhodes and Sharp, $100; to Rhodes' Farm Account, $100; cashier's check, $2,000, payable to cash; unaccounted for, $200.

The District was credited with five items January 12, 1934, aggregating $2,407.80. It was charged with $3,515.01, for which no corresponding bonds, coupons, or other permissible payments could be identified. An unsigned bank debit memorandum bore the notation, "three 1931 bonds and interest." The schedule of retired bonds does not sustain a charge of the character made. Miscellaneous accounts credited the day the District's account was charged are: Earle Place, $595.36; R. V. Wheeler, $300. The total of these two items is $895.36. This, with $2,407.80, makes $3,303.16. Credits not traced amounted to $211.85, and this, added to $3,303.16, according to Ellis, accounts for the diversion of $3,515.01.

[16] According to W. B. Scott's testimony, the "Earle Place" belonged to his brother, John W. Scott. Lands known as the Thompson place were owned by W. B. Rhodes and John W. Scott.

The Ellis audit relating to the entries covers two typed pages and is somewhat complicated. It is by no means certain the individuals, whose accounts increased simultaneously with disappearance of the District's funds, acquired their gains from this source, and we do not so hold. But the net result is the same: that is, $3,515.01 disappeared, with no corresponding reduction in the District's indebtedness.

May 29, 1934, the District's account was charged with $1,060 representing one bond and interest. The bond was purchased from Miss Minnie Collett for $660. The difference of $400, or an amount equal to the difference, was credited to the Thompson Place.

June 21, 1934, a charge of $3,180 was made against the District's bank account representing payment of principal of three bonds and interest. The bonds actually cost $1,650; difference, $1,530. Simultaneously credits appeared to the bank accounts of J. C. McCaa, Howard Curlin, Earle Place, and R. V. Wheeler, $306 each. Ellis makes the comment that presumably the other $306 went to Rhodes in cash.

The next deal occurred September 13, 1934, when $4,180 of District money left the Bank, with no corresponding returns. Ellis thinks certain credits to individuals were results of participation, namely:—$1,194.80 to Howard Curlin and equal amounts to the Earle Place, to J. C. McCaa, and to R. V. Wheeler. Rhodes is credited with $605.20. A $549.60 item is not traced, and it is not established that proceeds of the withdrawal of $4,180 went to these parties, although the accounts were credited September 13.

Four transactions similar to those explained, involved additional sums aggregating $5,468.16.

Final charge against the Bank is a check for $292.40 made payable to C. R. Head, whose name appeared as an indorsement. But Head testified he did not indorse it, nor did he have any information regarding issuance or payment.

Counsel for the Bank think the Chancellor's action in dismissing the complaint against it should be af-

firmed (1) because appellants failed to comply with Rule Nine, and (2) because the limitation provided by § 768 of Pope's Digest bars the proceeding. It is also contended (3) that acceptance of $7,500 from the Rhodes estate operated as a release of the Bank, and (4) that the decree is not against a preponderance of the evidence. We have heretofore disposed of the first assignment.

The statutory shield it is sought to interpose on behalf of the Bank provides that "No claim shall be allowed unless proof thereof has been presented to the Commissioner within one year from date on which [the] Commissioner takes over the assets of the liquidated Bank."

Although the Bank closed February 7, 1938, and a deputy commissioner took charge on the 21st, claim was not filed until February 17, 1939. This, it will be seen, was more than a year after the Bank closed, but less than a year from the date the Commissioner's agent took charge. It is true the complaint did not expressly allege facts showing the statute of limitation had been tolled, but effect of all evidence was disclosure of manipulations by the Cashier-Receiver from which no inference can arise other than that there was and had been for years a carefully executed plan to conceal essential facts. The Bank Commissioner relies upon *Hope* v. *American Bonding Company*, 200 Ark. 1158, 143 S. W. 2d 193. In that case, however, it was said that nothing alleged in the complaint disclosed any reason for delay in filing the claim. In the case at bar the complaint should have been treated as having been amended to conform to the proof.

The old Commissioners—later Receivers—were directed by the Court to use Bank of Marion as a depository. Specifically, an obligation devolved upon the Receivers to keep accurate records, but this primary undertaking in no sense justified the Bank in permitting Rhodes (its dominant personality to whom other directors appear to have delegated all authority—or, if not having delegated it, they abdicated their own) to juggle against reckoning; to withhold credits from the District's accounts when funds were remitted; to convert

tax payments into the Bank's checks payable to cash (thus concealing from a landowner, a prospective purchaser, or other legitimately-interested person, information that money was on hand); to pursue a course of arbitrary conduct intended to mislead, and to marshal cash assets for the benefit of a preferred speculator when this speculator's interests and convenience suggested that certain bonds and interest be paid.

It cannot be seriously argued that ordinarily a statute of limitation is tolled when the person who seeks to invoke it has fraudulently brought about conditions which prevent a claimant from asserting his rights. *McCoy* v. *Lockridge,* 188 Ark. 197, 66 S. W. 2d 624.

The immediate question is, Does a different rule apply when the plea is interposed on behalf of a liquidating bank? No decision has been called to our attention wherein there has been read into the general principle an exception in favor of banks; nor does there appear to be any justification here for us to say that the General Assembly, in enacting § 768, intended that courts should construe it in a manner other than that with which the law-making body is conclusively presumed to have been familiar. Result is that we must hold appellants were not barred, and the Court erred in dismissing the complaint on that ground.

There was no "settlement," or compromise, with the Rhodes estate. Instead, payment of $7,500 was in consideration of a covenant not to sue. *Magnolia Petroleum Co.* v. *McFall,* 178 Ark. 596, 12 S. W. 2d 15, applies the rule that "in case of joint tort-feasors, the essential unity of the injury, and the fact that the injured party is entitled to but one compensation therefor, makes it impossible for the injured person to settle with one tort-feasor without discharging the other." *Missouri Pacific Railroad Company* v. *Hunt,* 193 Ark. 175, 98 S. W. 2d 74; *Missouri Pacific Railroad Company* v. *Burks,* 199 Ark. 189, 133 S. W. 2d 9.

Since the estate of W. B. Rhodes was not discharged by the covenant entered into by appellants, who only pledged themselves not to sue, it follows that the defense asserted as proposition No. 3 is not maintainable.

If Rhodes is to be regarded as the Bank's agent—and *all* of the evidence shows that in practical result of operations it was a one-man institution—its liability cannot be avoided on the theory that in diverting funds from the District, and later in conspiring with Thompson, Rhodes abandoned his status as cashier and acted individually. *Blanton* v. *First National Bank*, 136 Ark. 441, 206 S. W. 745; *Helena* v. *First National Bank*, 173 Ark. 197, 292 S. W. 140. It is argued that all of the acts ascribed to Rhodes in connection with missing funds could have been consummated by him if he had not occupied the positions he held. This contention is untenable. The very fact that he *was* cashier and had authority to issue checks or direct others to do so, coupled with the opportunities thus afforded by reason of his appointment as Receiver—these were events creating a status which gave him contact with the Bank's funds, the District's money, and with records he manipulated.

The next question is whether judgment should have been rendered against the estate of John W. Scott, it having been conceded that the executrix was not made a party. The District's claim for $32,516.27 was presented to the executrix and was disallowed. It was then filed with the clerk. No action has been taken by the Probate Court.

Insistence is that the receivership was pending in Chancery, and that it was the Court's duty, on motion of appellants, to require the executrix to submit a detailed report showing all moneys coming into Scott's hands as co-receiver, and the disposition made of such funds.

While the Chancellor, with propriety, could have directed settlement in the manner contended for by appellants, it must be remembered that the executrix had no independent information concerning receivership affairs. Appellants asserted their claim in Probate Court. They should not now complain of a procedure adopted at a time when the course they charted seemed best suited to the end in view.[17]

---

[17] It is not now contended by appellants that judgment should be rendered (a) against the receivers in succession; or, (b) against officers of the defunct bank personally; or (c) against C. W. Cooper. The appeal was not perfected within 90 days, hence summons issued from this court when the appeal was granted. J. C. McCaa was not named in the summons.

As to the estate of Howard Curlin, there are circumstances indicating profits made from the purchase of bonds were divided with him. It is possible that division of funds in which Curlin seems to have participated represented money other than margins on Tri-County transactions. It is also possible that Rhodes used the apparent deposits as a cover-up, and that proceeds did not, in fact, reach Curlin, notwithstanding depletion of the account. In any event, we do not think the evidence and attending circumstances require that the Chancellor should be reversed as to this item.

Finally, it is asserted that the bond of Rhodes, Cooper, and Scott (as receivers) upon which the names of Z. T. Bragg and H. C. Williamson appear as sureties, does not create liabilities against Bragg and Williamson because the so-called signatures were forged.

Bragg and Williamson each denied having signed the document. They declared that at the time the bond is supposed to have been executed by the three principals, political and personal antagonisms were such as to result in estrangements; hence, serious consideration would not have been given a request to subscribe the obligation.

Bragg and Williamson, while testifying, spoke of "the Commissioners' bond." Appellants think there was failure by these witnesses to expressly deny they were sureties on the Receivers' bond. The only paper in evidence was that supplied by the Receivers in response to the Court's direction. It was this instrument the two sought to be held as sureties were referring to, although they were inexact in designation.

Testimony controverting Bragg and Williamson was given by Edward A. Parker, superintendent of the bureau of identification, Memphis police department. Parker had seen the genuine signatures of Bragg and Williamson. He pointed to similarities in penmanship and expressed the opinion that corresponding names on the bond were in the same handwritings as those admitted to be authentic. The Chancellor thought evidence preponderated in favor of these defendants. We cannot say this was error.

Our review of the case as a whole is that judgments in favor of Bragg and Williamson, and in favor of the estates of Howard Curlin and John W. Scott (the latter only insofar as it was sought to procure judgment in Chancery Court in the present action) should be affirmed.

The judgment allowing Thompson to recover on the District bonds and interest, as set out in the Commissioner's amended report, is reversed. The decree declining to render judgment against the Bank for $17,936.56 is also reversed and the relief prayed will be granted by the Chancellor on remand.

The Receivers will not be permitted to pay any part of Thompson's claim—this because, as the Commissioner and Court found, and as we find, all bonds purchased by the Memphis speculator subsequent to his contract with Rhodes were acquired pursuant to a plan to utilize and capitalize Rhodes' status as Receiver (an officer of the Court) and his position as cashier, to prevent payment of bonds held by others; this to the end that prices would remain depressed and all assets of the District might be held for benefit of the *entente*.

In these circumstances a court of equity will not lend its aid; nor will it permit the high office to be used by persons promoting an expedition in questionable financial ventures.

The Clean Hands Doctrine is too well established in our jurisprudence to require repetition of maxims or citation to case or text. It emphatically says to despoilers that contaminated transactions shall not entice equitable dispensation. It asserts that he who knocks at the door of justice may not gain entrance with a password of deception.

In respect of Thompson, no posthumous regeneration through interposition of the *ex parte* certificate of one who is *particeps criminis* can have the effect of legitimatizing a series of acts so unfortunately conceived within the Court's environment, of which the Chancellor had no hint.

The Receivers and their successors, or Commissioners (if such there should be), are permanently enjoined from paying the bonds in question, or interest.

Mr. Justice FRANK G. SMITH did not participate in the consideration or determination of this case.